# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| NATHAN GRANT, | : | |
| Plaintiff, | : | |
| | | Case No. 3:13cv00143 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| CAROLYN W. COLVIN, | : | Chief Magistrate Judge Sharon L. Ovington |
| Acting Commissioner of the | | |
| Social Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.  Introduction

Plaintiff Nathan Grant brings this case challenging the Social Security Administration's denial of his applications for Disability Insurance Benefits and Supplemental Security Income.  The denial was warranted, according to Administrative Law Judge (ALJ) Paul R. Armstrong, because Plaintiff could still perform his last job (past relevant work) as a "commercial/institutional cleaner," meaning he was not under a benefits-qualifying "disability" under the Social Security Act.  This Court has jurisdiction to review the administrative denial of Plaintiff's applications for benefits.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), the administrative record (Doc. #7), and the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision and remanding this case to the Social Security Administration for payment of benefits dating back to Plaintiff's 55th birthday. The Commissioner seeks an Order affirming the ALJ's decision.

## II.     "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). A "disability" consists only of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### III. <u>Plaintiff's Background and Testimony</u>

Plaintiff turned age 55 in 2009 thus placing him in the category of a person of "advanced age" for Social Security purposes. *See* 20 C.F.R. §§404.1563(3); 416.963(e).[2] He has a high school education. His past jobs included work as a quality inspector with General Motors; a cleaner or janitor in an office, hospital, and church; and a warehouse worker. (Doc. #6, PageID at 70, 72-73, 192). Plaintiff's jobs after working for General Motors were part-time through a temporary employment service, Manpower of Dayton, Inc. *Id*., PageID at 71.

In February 2009, Plaintiff went to the hospital with shortness of breath upon exertion (since the day before) and intermittent chest pains. *Id*., PageID at 260-69. He also reported having a "severe depressive mood" since being fired from General Motors. *Id*., PageID at 269. He was admitted to the hospital to rule out cardiac problems. Plaintiff removed his own IV and walked out of the hospital without being discharged after becoming "very agitated" because a nurse would not give him a fruit cup. *Id*., PageID at 265.

On August 21, 2009, Plaintiff went to the hospital emergency department and presented himself to the triage window. He was "running around frantically" due to severe pain and pressure occasioned by being unable to urinate. *Id*., PageID at 275-79. His pain was relieved by inserting a catheter. Within a week, Plaintiff saw a urologist, Dr. Miller,

---

[2] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

3

who proscribed Flowmax, ordered a renal ultrasound, and ultimately removed Plaintiff's catheter. The ultrasound revealed an enlarged prostate and a renal mass, leading Dr. Miller to order a CT scan. (Doc. #6, PageID at 292-93). The CT scan was performed September 12, 2009, confirming that Plaintiff's prostate was enlarged, but revealing no evidence of renal mass. *Id*., PageID at 295-96. A month later, a prostate ultrasound and biopsy were performed Dr. Miller's office. The results were positive for chronic inflammation but negative for malignancy. *Id*., PageID at 315-19, 321.

In May 2010, Plaintiff sought help for his mental-health problems at Day-Mont West Behavioral Health. He reported that he was experiencing angry, hostile, and aggressive moods and "behaviors that have resulted in loss of employment, marital discord [and] dissatisfaction [with] how he settles conflicts and responds to confrontation...." (Doc. #6, PageID at 365). He related that he had one friend he "confides in." *Id*., PageID at 366. He reported that he was incarcerated from 1978 to 1991 for armed robbery and from 1995 to 2000 for aggravated trafficking. *Id*., PageID at 369. He was not showing signs of detox during his interview, *id*.; he previously completed a methadone detox program that lasted 30 to 45 days at Project Cure. *Id*., PageID at 374. He informed the interviewer that he had first used cocaine at age 18 and heroin at age 20, but he had not used either drug in the preceding year. He first used cannabis at age 18 and last used it on May 4, 2010 (the day before his interview). *Id*., PageID at 369. The interviewer noted that Plaintiff experiences "explosive anger, mood swings [and] uses cannabis 'to stay calm'; he

experiences "related anxiety/internal stress in social interactions in social interactions"; and "anger interferes [with] communication[,] in job stability, [and] sustaining relationships." (Doc. #6, PageID at 372). His GAF was estimated at 50, *id*., PageID at 374, indicating a person experiencing "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34.[3]

During the ALJ's hearing Plaintiff told the ALJ that in early 2000, he had worked for an Acura dealership until he "smacked a dude because he had asked [Planitiff] to go outside and pick up cigarette butts and [Plaintiff] didn't even smoke." (Doc. #6, PageID at 81).

Plaintiff worked with General Motors through 2005 when he was fired. He explained, "I had an outburst and I beat up a white guy on my job." *Id*., PageID at 70. He added, "Being black, I was the only one terminated from General Motors, sir." *Id*. At that point, he "tried to survive on and off drugs, in and out of jail, in and out of trouble." *Id*. Plaintiff testified, "I lost eight jobs in a row because of my temper, attitude or putting my hands on someone. I've been in jail over 27 years of my life and outside of that, I've been on drugs...." *Id*.

During the hearing, the following colloquy explored Plaintiff's lack of employment:

---

[3] At the time of Plaintiff's evaluation, GAF, or Global Assessment of Functioning, was a tool described in DSM-VI-TR to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. The most recent version of the DSM – DSM-5 – has eliminated the GAF scale.

> Q. [by Pl.'s counsel] In these part-time jobs that you've had since you left General Motors, have you gotten in trouble for getting in fights with people?
>
> A. I lose every job I get.
>
> Q. You said that you had eight different jobs in that time period?
>
> A. Two temporary services and Alpha and Omega Custodial, Auto Advance, a guy that had a junk yard, Tabernacle Church. The deacon.
>
> Q. That was all for fighting?
>
> A. Yes.

(Doc. #6, PageID at 76). At this point, the ALJ asked Plaintiff:

> Q. Did you lose the job with Tabernacle?
>
> A. They sought [presumably, "sort"] of suggested I find something else because I invited the deacon accross the street. That's what happened. They suggested I find something else.
>
> Q. The deacon is a nice guy, wasn't he?
>
> A. Sort of like you, a righteous [expletive].

*Id*.

Plaintiff described his emotional state during the ALJ's hearing as "moody." *Id*., PageID at 75. He noted, "For the record, sir, I don't like none of y'all. For real, I don't." *Id*. When asked by his counsel what he meant, Plaintiff testified:

> You mother [expletive] imprisoned me for half my life and put me out here in society and expect me to get able to function like ain't nothing wrong. And then I come in here and sit in front of this self-righteous [expletive] and tell me what he don't make and pass judgment on me about what's right and

what's wrong.

(Doc. #6, PageID at 75). Later in the ALJ's hearing, Plaintiff testified that after GM fired him, his problems continued, if not worsened:

> I just, my hatred for white people has increased because unfair justice has just crushed me aside and it wants me to hurt y'all every chance I get and every chance I get I hope it to be your son, your grandson or somebody that I inflict pain on so it reaches home. Because your pain on me has reached my family.

*Id.*, PageID at 80.

Plaintiff also discussed his physical problems during his testimony. He indicated that he urinates blood during the day and cannot pass urine at night. *Id.*, PageID at 71, 74-75. This keeps him up at night, affecting his mood the following day. Plaintiff attributed these problems to his prostate and hepatitis C. *Id.*, PageID at 77. His blood pressure is elevated with symptoms of headaches, lightheadedness, and irritability. *Id.*, PageID at 79. Plaintiff also has problems with his right rotator cuff. *Id.*, PageID at 71. His shoulder "goes dead" when he sleeps and locks up on him with terrible pain. *Id.*, PageID at 76-77.

Returning to his treatment records from Day-Mont West Behavioral, in August 2010, Plaintiff "presented in a depressed and angry mood" during his therapy session, and he tended to shut down when confronted about it. *Id.*, PageID at 400. A treatment note in September 2010 reflects that Plaintiff had been calling his social worker in between appointments due to being angry at someone at his job. *Id.*, PageID at 399. On January

27, 2011, Plaintiff reported that he was still "very angry and depressed and having problems sleeping." (Doc. #6, PageID at 397). On February 17, 2011, he explained he was having problems controlling his anger and "expressed hatred toward the white race." *Id*., PageID at 538. Plaintiff was angry and agitated during a meeting with his social worker on March 20, 2011. *Id*., PageID at 526. He reported being angry on April 11, 2011. *Id*., PageID at 537.

An updated psychological assessment was performed on April 15, 2011. *Id*. PageID at 533-36. Plaintiff was noted to suffer from "extreme anger" with a history of homicidal and suicidal thoughts. He was depressed, anxious, irritable, angry, and aggressive during the evaluation. *Id*., PageID at 535. He was assigned a GAF score of 40, *id*., indicating a person experiencing "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work ....)." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34 (capitalization in original).

On April 20, 2011, Plaintiff continued to feel stressed, anxious, and angry; he understood, but was unable to control the triggers to his anger. (Doc. #6, PageID at 531). On May 20, 2011, Plaintiff reported that he hates white people, and he was having "weird dreams (sleep vs. real)." *Id*., PageID at 524.

A June 2, 2011 note indicates, "Client thinks he is going to jail because he punched a white man. Client explains that he perceived the comment 'Hey brother, tell me a joke' as racist, disrespectful, and offensive...." (Doc. #6, PageID at 522). On June 20, 2011, Plaintiff reported that he was still upset because he was not treated fairly at work and he "can prove that blacks and whites are treated differently." *Id*., PageID at 521. Plaintiff stopped the session early because he began feeling tension in his head such that he had to cut his appointment short.

On July 6, 2011, Plaintiff informed his social worker that his anger had increased, and he had recently beaten up his sister "because she was nagging and complaining." *Id*., PageID at 518 . On July 8, 2011, just a couple weeks before his hearing (on July 21, 2011), Plaintiff called Day-Mont West and stated that he need to talk with his therapist, adding "I put my hands on somebody." *Id*., PageID at Tr. 516.

Plaintiff was hospitalized for two days in March 2011. He reported numbness along the left side of his body. *Id*., PageID at 404-37. A brain MRI revealed that he was suffering from an acute right thalamic lacunar infarct (a stroke) and had suffered a pontine lacunar infarct in the past. *Id*., PageID at 401-02. He was stabilized, his medications were adjusted, and he was discharged home. *Id*., PageID at 404.

Plaintiff went to the hospital on March 23, 2011 for a cardiac ultrasound which revealed less than 50% stenosis of his right carotid artery. *Id*., PageID at 438-39. Plaintiff returned to the hospital emergency room on March 28, 2011, with a headache occasioned

9

by severely elevated blood pressure. (Doc. #6, PageID at 444-92). Despite adjustments to his medications, his blood pressure remained elevated at discharge. He followed up on this problem and the residuals of his stroke at Good Samaritan Family Practice with continued complaints of headaches and extremity weakness. *Id.*, PageID at 493-505.

**IV.    The ALJ's Decision**

Social Security Regulations required ALJ Armstrong to resolve Plaintiff's disability applications through a five-Step sequential evaluation of the evidence. *See* 20 C.F.R. §404.1520(a)(4); *see also Gayheart v. Comm'r of Social Sec.*, 710 F.3d 365, 374-375 (6th Cir. 2013). Under the sequential evaluation, a dispositive finding at any Step terminates the ALJ's review. *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

At Step 1 of the sequential evaluation, ALJ Armstrong found that Plaintiff had engaged in substantial gainful activity from January 2010 to January 2011. The ALJ therefore found Plaintiff ineligible for benefits during this period. Yet the ALJ further found, "there has been a continuous 12-month period since the alleged onset date [February 5, 2007] during which the claimant did not engage in substantial gainful activity." (Doc. #6, PageID at 54). The ALJ therefore continued with the sequential analysis, considering "the period the claimant did not engage in substantial gainful activity." *Id*.

At Step 2, the ALJ found that Plaintiff had the severe impairments of "antisocial personality disorder, polysubstance abuse, residual effects of cerebrovascular accident,

hypertension, kidney disease ...." (Doc. #6, PageID at 54). The ALJ found as Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments. *Id.*, PageID at 54-55.

At Step 4 the ALJ concluded, "the claimant has the residual functional capacity[4] to perform light work not requiring public contact or more than superficial contact with supervisors or co-employees." *Id.*, PageID at 55. The ALJ also found at Step 4 that Plaintiff could perform his past relevant work as a "commercial/institutional cleaner." *Id.*

The ALJ did not reach Step 5 of the sequential evaluation. In light of his findings at Steps 1 through 4, the ALJ ultimately concluded that Plaintiff was not under a disability and not eligible to receive DIB or SSI.

## V.  Judicial Review

ALJ Armstrong's decision that Plaintiff is not under a benefits-qualifying disability is subject to review in this Court along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r. of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social*

---

[4] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

11

*Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

## VI. Discussion

### A. Plaintiff's Past Relevant Work

Social Security Regulations inform applicants that "past relevant work" is "work that you have done ... that was substantial gainful activity." *See* 20 C.F.R. §404.1560(b)(1). The Regulations define "substantial gainful activity" as "work activity that involves doing significant physical or mental activities..., and "work activity that [the applicant] has done for pay or profit." 20 C.F.R. §404.1572(a), (b). The Regulations explain to applicants, "Your earnings may show that you have done substantial gainful activity. Generally, in evaluating your work activity for substantial gainful activity

purposes, our primary consideration will be the earnings you derive from the work activity....." 20 C.F.R. §404.1574(a)(1) (italics omitted).

The Regulations also set an average-monthly-earnings threshold for substantial gainful activity.[5]  In 2010, the year the ALJ focused on when finding Plaintiff had engaged in past relevant work, the average-monthly-earnings threshold for substantial gainful activity was $1,000.  *See* http://www.socialsecurity.gov/OACT/COLA/sga.html.  Consequently, to constitute "substantial gainful employment," and hence "past relevant work," Plaintiff's average monthly earnings in 2010 must have exceeded $1,000.

The ALJ concluded that Plaintiff's "work as a commercial cleaner constitutes substantial gainful activity because [he] earned $15,532 in 2010, resulting in monthly countable average earnings exceeding the monthly earning threshold for substantial gainful activity."  (Doc. #6, PageID at 59-60).

Plaintiff argues that the ALJ erred by using $15,532 – his total earnings in 2010 – to calculate his average monthly earnings because his earnings in 2010 came from two separate sources:  cleaning for Tabernacle Baptist Church (earning $8,974.16) and temporary work through Manpower of Dayton, Inc. (earning $6,558.30).  (Doc. #7, PageID at 559)(citing PageID at 181-82).  Plaintiff emphasizes that the vocational expert classified

---

[5]  "If your average monthly earnings are equal to or less than [a certain threshold amount] ... for the year(s) in which you work, we will generally consider that the earnings from your work as an employee ... will show that you have not engaged in substantial gainful activity...." 20 C.F.R. §404.1574(b)(3)(i); *see id*., §§404.1574(a), (b)(2)-(3); *see also Dixon v. Comm'r of Social Sec.*, 3:11-CV-482, 2012 WL 2826970 at *14-15 (N.D. Ohio July 10, 2012).

13

these as two separate jobs with two different exertion levels: heavy exertion for the job of commercial/industrial cleaner; medium exertion for "the job at the church as the church janitor." (Doc. #6, PageID at 82).

Substantial evidence does not support the ALJ's finding at Step 4 that Plaintiff earned $15,532 in 2010 working as an commercial/industrial cleaner.  This directly conflicted with the vocational expert's testimony that Plaintiff engaged in two different occupations in 2010 with two different exertional levels.  *Id*.  Although the Regulations did not require the ALJ to accept this aspect of the vocational expert's testimony, *see* 20 C.F.R. §404.1560(b)(2) ("we may use the services of vocational experts ...."), the ALJ did not point to other evidence showing that Plaintiff's total income in 2010 came from the same "cleaner" jobs that involved the same exertional level.  *See* Doc. #6, PageID at 59-60. The Commissioner contends that the ALJ did not err at Step 4 because the vocational expert identified Plaintiff's work as a commercial/industrial cleaner as his past relevant work.  The Commissioner correctly recognizes that Plaintiff's past relevant work included commercial/industrial cleaner.  *Id*., PageID at 81-82.  But, a review of the vocational expert's testimony does not reveal that he considered Plaintiff's earnings when identifying Plaintiff's past relevant work.  *See id*., PageID at 81-86.  The vocational expert instead based his testimony on "the *Dictionary of Occupational Titles*, "Selected Characteristics of Occupations[,]" *id*., PageID at 81, which does not consider workers' earnings when defining occupations.  At most, then, the vocational expert's testimony assisted the ALJ in

14

determining the appropriate exertional levels for Plaintiff's past relevant work without being probative of whether Plaintiff's past jobs constituted past relevant work based on his earnings.

In addition, assuming *arguendo* that Plaintiff's work as a commercial/industrial cleaner constituted past relevant work, the ALJ's finding at Step 4 that Plaintiff could perform such work is not supported by substantial evidence.  The ALJ ignored or overlooked the vocational expert's testimony that a hypothetical person with Plaintiff's residual functional capacity could not perform the work of a commercial/industrial cleaner.  As set forth above, *supra*, §IV, the ALJ set Plaintiff's residual functional capacity at the light exertional level "not requiring public contact or more than superficial contact with supervisors or co-employees."  (Doc. #6, PageID at 55).  The ALJ asked the vocational expert whether a hypothetical individual with this residual functional capacity could "return to any of the past relevant work of the claimant.  *Id*., PageID at 82-83.  The vocational expert testified, "I do not believe so, sir.  Not per the *Dictionary of Occupational Titles*.  *Id*., PageID at 83.  The colloquy continued:

    ALJ:   The commercial cleaner is done?

    A:     Yes, sir.

*Id*.  The ALJ did not identify evidence contrary to the vocational expert's testimony upon which he relied to support his conclusion that Plaintiff could return to his past relevant work.  The ALJ relied on a single page of Plaintiff's Work History Report, Exhibit 5E,

15

page 6. (Doc. #6, PageID at 60). Review of this evidence in context reveals that Plaintiff reported he performed the lifting requirements of light exertional work when working part-time for the church in 2009. *Id.*, PageID at 217-18, 224. Such evidence is not contrary to the vocational expert's testimony in July 2011 that a hypothetical person working with Plaintiff's residual functional capacity for light work could not return to his past relevant work, including his past work as a commercial/industrial cleaner. Additionally, Plaintiff is correct that Exhibit 5E is silent on Plaintiff's restriction to work involving no public contact and no more than superficial contact with the public and therefore has no probative value about whether a hypothetical person with all Plaintiff's limitations – as set by the ALJ – could return to his past relevant work. Consequently, the ALJ's citation to Exhibit 5E of the record fails to identify evidence contrary to the vocational expert's testimony.

The Commissioner contends, "Plaintiff should have been aware of the record's indication of his past relevant work as a commercial cleaner, and it was his burden to rebut that conclusion in order to prevail before the ALJ." (Doc. #12, PageID at 583). Given the substance of the vocational expert's testimony that Plaintiff was unable to perform his past relevant work, including his work as a commercial/industrial cleaner, the record contained sufficient evidence to meet Plaintiff's burden at Step 4.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[6]

---

[6] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's challenge to the ALJ's mental residual-functional-capacity assessment is unwarranted.

### B. Remand is Warranted

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above. On remand the ALJ should be directed to (1) evaluate all the evidence of record under the legal criteria applicable under the Commissioner's Regulations and Rulings and as mandated by case law; and (2) review Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and thus eligible for DIB and SSI.

**IT IS THEREFORE RECOMMENDED THAT:**

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Nathan Grant was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4. The case be terminated on the docket of this Court.


March 20, 2014

                 s/Sharon L. Ovington
                 Sharon L. Ovington
             Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).